LEIF J. SVERDRUP, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20065.   Promulgated May 16, 1950.

*G. W. Marsalek, Esq.*, and *W. E. Moser, Esq.*, for the petitioner.
*George E. Gibson, Esq.*, for the respondent.

### OPINION.

JOHNSON, *Judge*: Respondent determined a deficiency in income tax and victory tax for the taxable year 1943 in the amount of $29,466.79.   By virtue of the Current Tax Payment Act of 1943 the deficiency is asserted for 1943, although the controversy involves only the year 1942.   The sole question is whether petitioner was entitled to exclude from his gross income in 1942 certain amounts totaling $41,279.30 under section 116 (a), Internal Revenue Code, prior to its amendment by section 148 (a) of the Revenue Act of 1942 and by section 107 (b) of the Revenue Act of 1943.

The facts are stipulated.

Petitioner is now and was during the period here involved an individual citizen of the United States, with offices in St. Louis, Missouri, and he resides in Richmond Heights, St. Louis County, Missouri. The returns for the period here involved were filed with the collector of internal revenue for the first district of Missouri.

From prior to January 1, 1942, until May 8, 1942, petitioner was an active member of the engineering partnership of Sverdrup &

Parcel (hereinafter referred to as the partnership), composed of petitioner, John I. Parcel, and E. R. Grant. The partnership was originally organized in 1928 and by the terms of a partnership agreement dated April 9, 1935, the net profits of the partnership were shared as follows: Leif J. Sverdrup, 55 per cent; John I. Parcel, 30 per cent, and E. R. Grant, 15 per cent.

During the year 1942 the partnership, as one party, and J. Gordon Turnbull, an individual of Cleveland, Ohio, as the other party, were engaged in a joint venture (hereinafter referred to as the joint venture), under an agreement executed July 10, 1941. The joint venture was formed for the purpose of performing contracts which related to the national defense program of the United States. By agreement of the parties, such contracts, if mutually acceptable, entered into either by the partnership or by Turnbull, were to be performed jointly by both parties to the joint venture agreement.

Prior to May 8, 1942, the partnership entered into four contracts with the United States of America, each designated "Fixed Fee Contract for Architect-Engineer Services," and numbered DA-W-414-eng-511, DA-W-414-eng-585, DA-W-414-eng-842, and Contract No. 1 (Australia), respectively. These contracts were to be performed in Australia and New Zealand and on islands located in the South and Southwest Pacific Ocean, outside the continental United States, Hawaii, and Alaska. Contract No. DA-W-414-eng-511, which may be considered as typical of all the contracts, provided in part:

ARTICLE VI

Fixed-Fee and Reimbursement of Expenditures:

1. In consideration for his undertakings under the contract, the Architect-Engineer shall be paid the following:

a. A fixed fee to be determined and set forth in a supplement to this contract when the preliminary estimated construction cost of the said project has been determined in accordance with the provisions of Paragraph 2 of Article V hereof. The amount of the fee will be based upon the preliminary estimated construction cost of the project and will be determined in conformity with the schedule of approved fees for Architect-Engineer Services as published by the Under Secretary of War. The fee shall constitute complete compensation for the Architect-Engineer's services, including the services of the individual or individuals furnished for full-time resident direction of the project under the provisions of Paragraph 1 of Article II of this contract, and all overhead expenses except as otherwise herein expressly provided. Payment on account of the fixed fee shall be made as provided in Article VIII hereof.

This contract also provided that, in addition to the payment of the fixed fee, the architect-engineer was to be "reimbursed for such of his actual expenditures as may be approved or ratified by the Contracting Officer," including wages paid to employees of the architect-engineer, subcontracts, social security payments, travel expense, etc.

The Government also agreed to provide all office and drafting-room space, supplies, and facilities necessary for the proper performance of work under the contract.

Prior to their execution, the aforesaid contracts were determined to be mutually acceptable to the parties to the joint venture and, with the knowledge of the contracting officer for the United States of America, were to be performed by the joint venture; but because of emergency conditions then prevailing and the absence of J. Gordon Turnbull, the contracts, which were signed in Hawaii, were executed in the name of the partnership only, but, pursuant to the joint venture agreement, the contracts were performed by the partnership and Turnbull jointly in accordance with the terms of the joint venture agreement.

Petitioner was the "field" representative of the joint venture. Except for seven days (February 27 and 28, March 1 and 2, and April 24, 25, and 26) spent in Hawaii, for a period beginning November 2, 1941, to April 27, 1942, petitioner was continuously physically absent from the continental United States, Hawaii, and Alaska, and was actually living upon or traveling between Australia, New Zealand, New Caledonia, Norfolk Islands, and Society Islands, all located in the South Pacific and Southwest Pacific area, in connection with the performance of the contracts above referred to. The specific services rendered by petitioner consisted of (1) selecting sites for the construction of airfields and airdromes on New Caledonia, Norfolk Islands, Society Islands, Penhryn, Christmas Island, the Marquetas Islands, Caroline Island, Cook Island, the Austral Islands, the Tonga Islands, the Kermadee Islands, the Chatham Islands, and New Zealand; this work was done by air and land travel; (2) after selecting the sites, petitioner personally supervised the actual surveys preliminary to construction; (3) there being neither men nor material available from the United States, petitioner negotiated and effected arrangements with the Prime Ministers and other officials of Australia and New Zealand for the hiring and shipment of men and materials from those countries and the obtention of necessary ships to enable construction to be performed; (4) after construction began he supervised construction operations on the various islands by air travel until his connection with the work ceased and the uncompleted contracts were terminated and construction was completed by the Corps of Engineers of the United States Army.

During 1942 petitioner was not in Alaska; during that year he was within the continental limits of the United States and Hawaii 26 days, having left Palmyra Island on April 23, 1942, and arrived in the United States on April 27, 1942 (having stopped in Hawaii for a period of 3 days). On May 8, 1942, petitioner was commissioned a

colonel in the Army of the United States and he remained on active duty with the Army of the United States until April 1946, when, as Major General, Commanding, Engineer Construction Command, Southwest Pacific, he was transferred to reserve duty.

On May 8, 1942, under Army orders, he was directed to report to Melbourne, Australia. Pursuant to those orders he departed from the United States on May 15, 1942, and, after stopping en route in Hawaii for a period of one day, he spent the entire remainder of the year 1942 in or traveling between Australia and New Guinea, being on continuous active duty with the Army of the United States. Thereafter, petitioner was continuously outside the Americas until December 8, 1945, except for a brief furlough in July, 1945.

In addition to the contracts above referred to, during the year 1942 the joint venture also was engaged within the continental United States in engineering work in connection with the construction of Midwest Air Depot, Wright Field Engine Test Stands, Patterson Field Maintenance Command Building, plant of Guiberson Diesel Engine Co., Garland, Texas, Wright Field Wind Tunnel, Mobile Air Depot Groups, Wright Field Administration Buildings, plant of Missouri Shipbuilding Co., St. Louis, Missouri, Modification Center #4, Kansas City, Missouri, and plant of North American Aviation Co., Kansas City, Kansas. All of the foregoing work was done under contracts with the United States, except the work for Missouri Shipbuilding Co., a corporation, which was performed under a subcontract with Missouri Shipbuilding Co., which company had a "Navy Contract" with the United States and the work for Guiberson Diesel Engine Co. and North American Aviation Co., which was performed by the joint venture under contracts between each of those companies, acting for and on behalf of Defense Plant Corporation, a Government agency, and J. Gordon Turnbull, Inc., a corporation, and the partnership. With reference to the Missouri Shipbuilding Co. contract, the joint venture was paid by Missouri Shipbuilding Co. With reference to the Guiberson Diesel Engine Co. and North American Aviation Co. contracts, J. Gordon Turnbull, Inc., and the partnership were paid by Defense Plant Corporation, and all said payments were deposited in the joint venture bank account, referred to below.

Separate and distinct from the offices of the partnership, in St. Louis, Missouri, and those of J. Gordon Turnbull, in Cleveland, Ohio, the joint venture, during 1942, maintained offices in Edmonton, Canada; St. Louis, Missouri; Tulsa, Oklahoma; Kansas City, Missouri; Louisville, Kentucky; Fiji; Penhryn; Tongatabu; Noumea, New Caledonia; Auckland, New Zealand; Autitaki and Townsville, Australia. The number of employees at said offices on the pay roll of the joint venture amounted to from 5 in the smallest of the offices to

more than 500 in the largest. In addition, during 1942 the joint venture employed construction workers, all of whom were on its pay roll.

In addition to $410,490.05 paid as reimbursable expenses, the Treasurer of the United States paid the partnership the total amount of $156,758.89 for the performance in the year 1942 by the joint venture of the contracts mentioned above, all of which was deposited in a bank account maintained by and to the credit of the joint venture, entitled "J. Gordon Turnbull and Sverdrup & Parcel, Consulting Engineers." There also were deposited in the same bank account amounts derived from all other sources for work done under the joint venture agreement. From the amounts so received, the joint venture paid all expenses of its operations, including nonreimbursable expenses totaling $24,834.14 incurred in the performance of the contracts referred to above, and at various times distributed to the partnership its proportionate share of the balance. The amounts so received by the partnership were deposited in its bank account entitled "Sverdrup & Parcel," in which were also deposited amounts received by the partnership from all other sources. The partnership paid from said fund all expenses of operation, clerical and engineering salaries and wages, fees for necessary professional services, rent, materials, supplies, office maintenance, etc.

After deduction of nonreimbursable expenses, the amount the joint venture derived in the year 1942 from the contracts referred to above was $131,924.75, of which the partnership's distributive share (50 per cent) was $65,962.37, and the petitioner's distributive share (55 per cent) of the latter amount was $36,279.30.

During the year 1942 the joint venture paid the petitioner $5,000 as additional compensation because of the nature of the work done by him in the performance of the contracts referred to above.

During that portion of the year 1942 after he was commissioned in the Army of the United States, and thereafter, petitioner performed no further service for either the joint venture or the partnership.

After petitioner was commissioned in the Army of the United States, John I. Parcel and E. R. Grant formed a new partnership, of which petitioner was not a member, and the new partnership formed a new joint venture with J. Gordon Turnbull, of which petitioner likewise was not a member.

Petitioner was a bona fide nonresident of the United States for more than six months during the taxable year 1942. The amount of $36,279.30, mentioned above, was paid to petitioner by the United States in 1942. The amount of $5,000, also mentioned above, was not paid to petitioner by the United States or any agency thereof in 1942. Both these amounts were received from sources without the United States and would have constituted earned income as defined in section 25 (a),

Internal Revenue Code (as in effect for the year 1942) had they been received from sources within the United States.

Petitioner contends that the amounts of $36,279.30 and $5,000, referred to in the preceding paragraphs are excludable from his gross income under section 116 (a), Internal Revenue Code,[1] prior to its amendment by section 148 (a) of the Revenue Act of 1942 and by section 107 (b) of the Revenue Act of 1943.

Respondent has determined that these amounts are not so excludable. It has been stipulated that petitioner is now and was during the period here involved an individual citizen of the United States. Respondent does not dispute that petitioner was a bona fide nonresident of the United States for more than six months during the taxable year 1942 and that the amounts in controversy were received from sources without the United States and would constitute earned income if received from sources within the United States. But it is respondent's position that, even assuming that the above requirements of the statute are met, petitioner is not entitled to the exemption provided by section 116 (a), for the reason that the amounts here in question are within the parenthetical exception to that exemption, having been "paid by the United States or * * * [an] agency thereof."

To deal first with the sum of $36,279.30, it has been stipulated that this amount was petitioner's distributive share of the net amount after deduction of expenses, derived from four contracts which petitioner and his partners entered into with the United States and which were performed by them and J. Gordon Turnbull under a joint venture agreement. It has also been stipulated that the total amount, including expenses, paid to the joint venture by the United States under the contracts was $567,248.94. Obviously, then, if the whole, $567,248.94, was paid by the United States, then the part, $36,279.30, was also paid by the United States.

But petitioner points out that it was only after the deduction of expenses by the joint venture that earned income remained to him in the form of his distributive share in the amount of $36,279.30. Therefore, he argues, this amount was not paid to him by the United States as earned income and therefore does not fall within the parenthetical

---

[1] SEC. 116. EXCLUSIONS FROM GROSS INCOME.

In addition to the items specified in section 22 (b), the following items shall not be included in gross income and shall be exempt from taxation under this chapter:

(a) EARNED INCOME FROM SOURCES WITHOUT UNITED STATES.—In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts would constitute earned income as defined in section 25 (a) if received from sources within the United States; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection.

exception in question. We see no merit in this contention. Section 116 (a) excludes from gross income "amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts would constitute earned income." The sum of $36,279.30 was received from sources without the United States, was paid by the United States, and, as petitioner himself agrees, constituted earned income to petitioner. The fact that it was part of a larger sum paid by the United States, the other part of which did not constitute earned income to petitioner, is immaterial.

Nor does the intervention of the joint venture and the partnership mean that the amount in question was not paid by the United States to petitioner. As said in *Craik* v. *United States* (Ct. Cls., 1940), 31 Fed. Supp. 132:

An examination of the various income tax Acts, beginning with the first one of 1913, shows that Congress in the enactment of each of them intended to treat partnership income as though the distributive share of each partner therein had been received directly by the partner. * * *

See also *Neuberger* v. *Commissioner*, 311 U. S. 83; *Randolph Products Co.* v. *Manning* (C. A., 3d Cir., 1949), 176 Fed. (2d) 190; *Jennings* v. *Commissioner* (C. C. A., 5th Cir., 1940), 110 Fed. (2d) 945; certiorari denied, 311 U. S. 704. Here, therefore, the amount of $36,-279.30, petitioner's distributive share of the partnership's income from contracts with the United States should be treated as though petitioner had received this amount directly from the United States.

It is clear, then, that the amount of $36,279.30 was, in the plain words of the statute, "paid by the United States" to petitioner. But petitioner urges that it was not the legislative intent to include under the phrase "amounts paid by the United States" amounts paid under contracts for services, as here, but only amounts paid to employees of the United States. Even assuming, *arguendo*, in the face of the plain words of the statute, that recourse to legislative history is warranted here, nevertheless, petitioner's contention is not sustained by that legislative history. The phrase "except amounts paid by the United States or any agency thereof" was added to the act in 1932. In that year the Senate amended the revenue bill passed by the House and from that bill eliminated entirely the exemption granted to nonresidents for income from sources without the United States. In Senate Report No. 665, 72d Cong., 1st sess., p. 31, the explanation of the Senate amendment was as follows:

Your committee believes there is no reason for the continuance of this exemption in the case of citizens of the United States residing abroad for the reason that under other sections of the Act such citizens are granted a credit for income taxes paid foreign countries and should not be further relieved from

Federal income taxes. Furthermore, a considerable portion of the individuals previously benefited by this subsection have been employees of the United States who, because of their status as such, were usually exempt from any foreign tax upon their compensation received from the United States; these citizens are not believed by your Committee to be entitled to a complete exemption from the Federal income tax upon such compensation.

In conference between representatives of the two houses, the matter was compromised, with the exemption being retained, but with the parenthetical exception here involved being adopted by amendment.

It is true that employees of the United States were particularly mentioned by the Senate committee as not being entitled to the exemption of section 116 (a). But the only reason given was that these employees were "usually exempt from any foreign tax upon their compensation received from the United States." It would seem then that the intent of the Senate committee was not to allow exemption from United States tax to citizens who because of their status also paid no foreign tax. Undoubtedly the committee meant to include in that group citizens under contract with the United States for services outside the country who may also have paid no foreign tax. At any rate, the failure to mention citizens under contract with the United States specifically in the committee report does not, in our view, indicate a clear legislative purpose to allow such citizens the exemption. It is significant that the words actually adopted in the amendment were broad. Neither the word "employees" nor the word "compensation" was used. Instead, the amendment as passed reads: "except *amounts paid* by the United States or any agency thereof." (Italics supplied.) Since the sum of $36,279.30 here in question was such an amount, we hold that respondent properly determined that that amount was not excludable from petitioner's gross income in 1942.

As for the sum of $5,000, also included by respondent in petitioner's gross income in 1942, it has been stipulated that this sum was paid to petitioner by the joint venture as additional compensation because of the nature of the work done by him in the performance of the contracts referred to above. This sum was not a part of the income of the partnership of which he was a member, but was paid to him as an individual for services rendered to the joint venture. Accordingly, it is not to be considered as his distributive share of income either of the joint venture or the partnership. *H. H. Wegener*, 41 B. T. A. 857; affd. (C. C. A., 5th Cir., 1941), 119 Fed. (2d) 49; certiorari denied, 314 U. S. 643. Therefore, contrary to respondent's determination, it was compensation paid to petitioner by the joint venture, not by the United States, regardless of whether the joint venture paid him out of funds it originally received from the United States. See *Charles F. Bouldin*, 8 T. C. 959. Actually, the joint venture apparently paid him out of its general funds, which included amounts

received both from the United States and from a subcontract with a private company, but, as we have indicated, the source of the $5,000 as to the joint venture is, under the facts, immaterial. All the requirements of section 116 (a) having been met, we hold that the sum of $5,000 was properly excludable from petitioner's gross income in 1942 under that section.

*Decision will be entered under Rule 50.*